

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00068-CV

_____

IN THE INTEREST OF J.A.W. AND S.P.W., MINOR CHILDREN

On Appeal from the 307th Judicial District Court
Gregg County, Texas
Trial Court No. 2008-168-DR

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

This is a joint appeal from termination of parental rights to two children, J.A.W. (the older girl) and S.P.W. (the infant). The parental rights of the mother (Princess) of both children, the father (Brandon) of S.P.W., and the father (Kelly) of J.A.W. were terminated, and the relief sought in connection with conservatorship and visitation privileges to the maternal grandmother (Patricia) was denied. Brandon, Princess, and Patricia all filed appeals; Kelly did not. Separate briefs were filed by each party, albeit with substantial overlap among the issues raised. Having found the evidence sufficiently supports the judgment and no other reversible error, we affirm the judgment of the trial court.

## I. GENERAL FACTS

Princess had a relationship with Kelly that resulted in the birth of J.A.W. Shortly thereafter, she lived with Brandon for a time, and S.P.W.'s birth resulted. While she and Brandon lived together, there is evidence that he repeatedly assaulted her, resulting in arrests, emergency room visits for Princess, and finally resulting in Brandon's current imprisonment. Brandon had also previously, during the lifetime of the child, been incarcerated in a state jail facility for six months after his revocation of community supervision on a felony theft conviction. Both children stayed at different times with Princess' mother, Patricia, and with Brandon's grandmother Nelderine.

2

Princess met Brandon in 2005 and lived with him in Nelderine's home. Brandon beat her on three specific occasions that resulted in hospital visits, the first time in April 2007, while she was pregnant, and the last time in January 2008, using a closet pole as a weapon. The last time, she was hospitalized. She nevertheless returned to live with Brandon. Princess' full scale IQ is fifty-four. The evidence shows that after S.P.W. was born, she stayed with Patricia or Nelderine and that Brandon had not provided anything for the child. After the assaults, Patricia had taken steps to get J.A.W. and her pregnant daughter out of Nelderine's home, and by December, both were living with Patricia. That did not last, however, as Princess took the child back to Nelderine's home shortly thereafter—where she could rejoin Brandon after his release from jail.

The Texas Department of Family and Protective Services (TDFPS) became involved following the December 2007 beating, during the short time that Princess was living with her mother. TDFPS was in the process of creating a "plan," and while doing so, discovered that Princess had moved back in with Nelderine—because her own mother was too strict and because she wanted to be with Brandon.[1] After Princess left her mother's home and returned to Brandon, TDFPS directed that the children should be placed with Patricia. TDFPS arranged meetings, which Brandon walked out of and which Princess attended only briefly.

In the next stage of the proceedings, the children had been living with Patricia for several months, until mid–April 2007, when TDFPS received a report that Patricia was using drugs.

---

[1]The evidence also showed that one of Nelderine's daughters had convinced Princess to put her name on Princess' social security checks, and had been using them for her own benefit.

Patricia admitted using marihuana, and (contrary to a court order directing that Princess could not have unsupervised contact with her children) had left the children with Princess while she was doing so. TDFPS removed the children from Patricia's home at that time and sent them to foster care. The evidence also shows that TDFPS found Patricia's home to be appropriate, clean, etc., and that drug tests of Patricia after the April 2007 incident were negative.

Brandon was incarcerated when S.P.W. was about five months old, and at the time of trial, he had completed twenty-two months of a six-year felony sentence for family violence against Princess. The likelihood of Brandon's release on parole was dubious; he had four prior convictions for assault and while incarcerated, he attacked a guard, which caused him to lose one year of good conduct time. There is no evidence that either child was ever injured by Brandon.

## II.     STANDARD OF REVIEW

The standard of review in parental rights termination proceedings is clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2009); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2003). The evidence is clear and convincing when the proof is such that it produces in the mind of the trier of fact a firm belief or conviction of the truth of the allegations sought to be established by the State. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *In re A.W.*, No. 06-07-00118-CV, 2008 WL 360825 (Tex. App.—Texarkana Feb. 12, 2008, no pet.) (mem. op.).

4

In reviewing the legal sufficiency of the evidence, we view all the evidence in a light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. Looking at the evidence in the light most favorable to the judgment means we must assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *J.F.C.*, 96 S.W.3d at 266.

In reviewing for factual sufficiency, we are to give due consideration to evidence the fact-finder could reasonably have found to be clear and convincing—whether it is such as to allow a fact-finder to reasonably form a firm belief or conviction about the truth of the State's allegations. If, on review of the entire record, we conclude that the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not have reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

We also acknowledge that sufficient proof of one statutory termination ground, together with the finding that termination is in the best interest of the child, is sufficient to support a termination order. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003).

## III.   PRINCESS

5

We first address Princess' argument that there is no or insufficient evidence to support a finding that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.

## A.    Grounds for Termination

The jury charge listed five different factors that are set out in the Texas Family Code as reasons to justify termination and instructed the jury that if it found that any one of them had occurred (and if in the best interest of the child), it could terminate her rights.[2]

Thus, the jury had multiple grounds on which it could have found termination appropriate, with no specificity as to which was actually utilized.   Accordingly, the trial court entered an order that listed each reason set out in the charge as a reason for termination.   Princess is required to address each possible reason for the verdict on appeal.

If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.   *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex.

---

[2]The five grounds for termination in the jury charge were:
   (1)       knowingly placing or allowing the child to remain in conditions which endanger the physical or emotion well-being of the child.   TEX. FAM. CODE ANN. § 161.001(1)(D);
   (2)       engaging in conduct or knowingly placing the child with persons who endanger the physical or emotion well-being of the child.   TEX. FAM. CODE ANN. § 161.001(1)(E);
   (3)       constructively abandoning the child in the TDFPS's custody.   TEX. FAM. CODE ANN. § 161.001(1)(N);
   (4)       failing to comply with a court order establishing the actions necessary for return of the child.   TEX. FAM. CODE ANN. § 161.001(1)(O); and
   (5)       having a mental or emotional illness or mental deficiency that rendered her unable to provide for the physical, emotional, and mental needs of the child and that such will continue until the child's eighteenth birthday.   TEX. FAM. CODE ANN. § 161.003 (Vernon 2008).

6

App.—Fort Worth 2003, pet. denied). It is not necessary that the offending conduct be directed at the child or that the child actually suffers injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). If the evidence shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under Section 161.001(1)(E) is supportable. *Id.* at 534; *In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.). In considering whether a relevant course of conduct has been established, a court may properly consider evidence of conduct that occurred both before and after a child's birth. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *In re S.T.*, 263 S.W.3d 394, 401–02 (Tex. App.—Waco 2008, pet. denied). In addition, a court may consider evidence establishing that a parent continued to engage in endangering conduct after the child's removal by TDFPS or after the child no longer was in the parent's care, thus showing the parent continued to engage in the course of conduct in question. *See C.A.B.*, 289 S.W.3d at 883; *Smith v. Sims*, 801 S.W.2d 247, 249–50 (Tex. App.—Houston [14th Dist.] 1990, no writ).

The evidence set out above shows that Princess kept company with a man who beat her repeatedly and that she took her oldest child into harm's way. The evidence also shows that during several of the beatings, she was pregnant with the younger child and feared injury to the fetus as a result of at least one of the beatings—and yet later returned to live with Brandon. TDFPS was involved with the family by that point, and Princess did not go to one meeting they had arranged with her, Brandon, and grandparents because she had injuries to her face—and then

7

hid in Brandon's apartment from the caseworker when she came by to check on her to see why she had not come to the meeting. There is evidence the older child was with her part of the time she was living with Brandon. There is no evidence that Brandon ever beat the children or harmed them physically in any other way. However, it is also clear that his actions in beating the mother would certainly injure the emotional well-being of the child. The fact that Princess chose for part of that time to leave J.A.W. with her mother is not dispositive and there is nothing to indicate any lasting change in Princess' behavior. We acknowledge that she will not be living with Brandon again, at least for some time, as he is now in prison. Nevertheless, she did choose to place herself in clear and repetitive danger, and for a portion of that time, J.A.W. was also exposed to such conditions. There was also evidence that S.P.W., after her birth, was taken into the situation, as Princess was still living with Brandon, and the child was taken back and forth to spend time with her—and then returning to Patricia's house.

This is, standing alone, sufficient evidence to allow a fact-finder to find by the requisite clear and convincing standard that Princess had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger the physical or emotional well-being of the child—as to both children. Because only one statutory ground for termination under Section 161.001(1) is necessary to support a judgment of termination, we need not address Princess' challenges to the sufficiency of the evidence supporting the alternative findings. *See*

8

TEX. R. APP. P. 47.1; *In re J.N.*, 301 S.W.3d 429, 433 (Tex. App.—Amarillo 2009, pet. denied); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.).

### B. Best Interest of the Children

Princess also argues that the evidence is insufficient because the TDFPS did not prove that termination of her parental rights was in the best interests of the children. In reviewing the sufficiency of the evidence to support the second prong, we apply the nonexclusive factors found in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the plans for the child by these individuals; (6) the stability of the home; (7) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *Id*.

The *Holley* factors, however, are not exhaustive, and no single consideration is controlling. *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.). Nor is a fact-finder required to consider all of them. *Holley*, 544 S.W.2d at 372. Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child. *C.H.*, 89 S.W.3d at 27; *M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305 (Tex. App.—El Paso 2009, pet. denied). On the other hand, the presence of scant evidence relevant to

each *Holley* factor will not support a finding. *C.H.*, 89 S.W.3d at 27; *M.C.*, 300 S.W.3d 305; *A.B.*, 269 S.W.3d at 126.

There is little testimony about the desires of J.A.W. beyond a statement that at one point, she wanted to go home and see her grandmother. Testimony about her behavior indicated that J.A.W. had problems with aggressive and angry behavior, but seemed to have bonded well with the foster parents. J.A.W. is seven years old. The infant is too young to express desires. This factor is effectively neutral as to both.

As to the emotional and physical needs of the child now and in the future, there is evidence that J.A.W. had a lack of emotional control and exhibited aggressive behavior at times. As presented, that evidence is not convincing as to anything beyond the fact that she is a child. However, this factor merges in this instance with the next one based on possible emotional and physical danger to the children now and in the future. The problem is not J.A.W.'s lack of control and her decision-making frailties; it is Princess' lack of control and her poor choices. Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

The cited evidence of Princess' insistence of remaining in a relationship with a man who hospitalized her, combined with the lack of any indication of a change in her behavior shows that she is a probable danger, both to the physical and emotional aspects of the children. Finally, the

10

need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re C.J.F.*, 134 S.W.3d 343, 351 (Tex. App.—Amarillo 2003, no pet.); *In re S.Z.G*, No. 12-02-00081-CV, 2003 WL 21771759, at \*6 (Tex. App.—Tyler July 31, 2003, pet. denied) (mem. op.). We also note that she effectively abandoned the children, moving out of town, and failing to visit or otherwise contact them for the six months before the trial. Her reason, as she explained, was because she believed she could never get the children back anyway. These factors weigh in favor of the TDFPS's position.

The evidence about Princess' parental abilities is of a woman with low intelligence, who has little focus on the care of her children, and whose behavior shows a focus on herself. She admitted at trial that she was not able to take care of her children by herself, but indicated that she would be willing to attend parenting classes. She has no apparent ability to care for her children herself, and wants the children returned to her family at large, with the stated idea that her mother would raise them. This shows a degree of understanding of her own weaknesses. Although this is commendable, it is not equivalent to showing that Princess has the ability to act as a parent. This factor also weighs in favor of the TDFPS's position.

So far as plans for the children by these individuals, there is nothing other than turning the children over to the grandmother to raise. Regarding the stability of the home—the mother has none, and lives either with other individuals or with her own mother. Both of those factors are somewhat in favor of the TDFPS's position.

11

There is nothing that indicates the existing parent-child relationship is not a "proper" one. This weighs in favor of Princess' position. Finally, there is no real excuse proffered for the acts or omissions of the parent as described above. At best, this is neutral.

Based on all of these factors, we find the evidence legally and factually sufficient to support the termination of Princess' parental rights.

## C. Constitutional Argument

Princess also contends that the termination statutes are unconstitutional as applied because they have denied her due process and due course of law—by restricting the issues that can be preserved and raised on appeal. This contention is directed at the much-maligned "statement of points" that must be filed within an extraordinarily short time frame and presented to the trial court before they can be considered later by an appellate court in reviewing the termination proceeding.[3] The TDFPS argues that we should reach none of these arguments because she has been unable to show any issues that would have been raised with effect, but for the unconstitutional restriction.

An "as applied" constitutional challenge is waived if not raised at the trial court level. *See In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003); *In re R.B.*, 225 S.W.3d 798, 802 (Tex. App.—Fort Worth 2007, no pet.); *In re B.S.W.*, 87 S.W.3d 766, 771–72 (Tex. App.—Texarkana 2002, pet. denied), *overruled sub silentio, on other grounds*, *A.V.*, 113 S.W.3d 355. Princess raised her

---

[3]An appellate court reviewing a termination of parental rights on the TDFPS's petition "may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal . . . ." TEX. FAM. CODE ANN. § 263.405(i) (Vernon 2008). To be timely, the statement of points must be filed within fifteen days of the date of the final order. TEX. FAM. CODE ANN. § 263.405(b) (Vernon 2008).

constitutional challenges at the trial court level in her timely motion for new trial as well as in her timely statement of points. The trial court heard argument on the issue at the hearing on the motion for new trial. Thus, the issue has been preserved. *See In re S.K.A.*, 236 S.W.3d 875, 887 (Tex. App.—Texarkana 2007), *pet. denied*, 260 S.W.3d 463 (Tex. 2008).

As we discussed in *S.K.A.*, and as other courts of appeals have stated, the statute contains the potential to create constitutional violations. The Fort Worth court has held, in a carefully written and well-supported opinion, that Section 263.405(i)

> is void because it violates the Separation of Powers Clause of the constitution to the extent that it forecloses our power to review issues properly preserved for appeal because the statute unduly interferes with our substantive power as an appellate court to rehear and determine issues on the merits that were decided in the court below.

*In re D.W.*, 249 S.W.3d 625, 640 (Tex. App.—Fort Worth 2008, pet. denied) (footnote omitted).

However, the facts in this case are distinctly different from those in *D.W.* In that case, the Fort Worth court was confronted with arguments that had not been preserved below and had not been raised in the statement of points. Thus, the court reasoned, the Legislature had attempted to eliminate the purpose for which courts of appeals exist by creating stringent requirements with the sole aim of allowing the TDFPS to avoid appellate review. The court was, by the terms of the statute, barred from considering the appellate issues on constitutionality because those grounds were not alleged in the statement of points and could not find any unconstitutionality harmless

13

because the statute stated that it may not "consider" that issue to determine whether she would be entitled to prevail—"if the statute did not preclude us from reviewing her complaint." *Id.* at 834.

In our case, detailed issues were timely propounded to the trial court, and counsel has suggested no other issues or arguments that he is prevented from making because of the application of the statute. The posture of this case is different from that facing the Fort Worth court.

The Texas Supreme Court has repeatedly stated that we should not delve into constitutional issues if other grounds dispose of an appeal. *See VanDevender v. Woods*, 222 S.W.3d 430, 432 (Tex. 2007) (noting courts should rest decisions on nonconstitutional grounds, if available, and not "wade into ancillary constitutional questions"); *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds.").

Applying that general restriction, several appellate courts have held that due process or separation of powers issues should not be addressed where there is no showing that the operation of the challenged statute harmed the appellant. *See, e.g.*, *M.C.*, 300 S.W.3d at 315–16; *Walker v. Tex. Dep't of Family & Protective Servs.*, No. 01-07-00867-CV, 2009 WL 1688469, at *7, 12 (Tex. App.—Houston [1st Dist.] June 18, 2009, pet. denied); *In re M.M.F.*, No. 2-08-014-CV, 2008 WL 5265033, at *7 (Tex. App.—Fort Worth Dec. 18, 2008, no pet.) (mem. op.).

14

Princess does not identify any issues that we have not already addressed which were preserved in the court below, but not raised herein, because those issues were not included in her statement of points. She has not shown how the statute operated to deprive her of the ability to raise certain challenges on appeal. Accordingly, we may not address the constitutional issues raised here, and the contentions of error are overruled.

## IV. BRANDON

We next turn to the arguments made by S.P.W.'s father, Brandon. He contends we should reverse the termination of his parental rights because there is legally and factually insufficient evidence to support termination on any of the several grounds set out by the court in the order of termination. Brandon further argues that termination was improper because the TDFPS made no effort to give him an opportunity to work a service plan to regain possession of his parental rights. He also raises the same constitutional arguments as those propounded by Princess, with the addition of a contention that the determination of whether an appeal is frivolous is also an unconstitutional usurpation of the function and jurisdiction of the appellate courts. His final argument is a *Batson*[4] claim.

### A. Grounds

We first address the legal and factual sufficiency arguments, utilizing the standards set out above. Brandon argues that the evidence is insufficient because it does not support the findings that knowingly placed or knowingly allowed the child to remain in conditions or surroundings

---

[4]*Batson v. Kentucky*, 476 U.S. 79 (1986).

15

which endangered the child's physical or emotional well-being and engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(1)(D), (E).

As set out above, Brandon is presently incarcerated for beating Princess. The evidence indicates he did so on several occasions, quite severely. As we have previously noted, endangerment does not require showing actual infliction of injury on the children—and can include events that happened before the birth of the child at bar. *See Wyatt v. Dep't of Family & Protective Servs.*, 193 S.W.3d 61, 68 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *In re B.B.*, 971 S.W.2d 160, 166–69 (Tex. App.—Beaumont 1998, pet. denied). Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *J.I.T.P.*, 99 S.W.3d at 845; *In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding clear and convincing evidence existed that termination of father's parental rights was in child's best interest where, among other factors, father was incarcerated at time of termination hearing and had pattern of criminal and violent conduct). Cases also note that incarceration is a legitimate factor for consideration on the issue of endangerment. *Boyd*, 727 S.W.2d at 533–34.

Based on the evidence of Brandon's continuing and repetitive violent behavior, we conclude that the evidence is both legally and factually sufficient to support an order terminating his parental rights on this basis.

16

We also note that he is presently imprisoned for a six-year term for the domestic violence described above. Under TEX. FAM. CODE ANN. § 161.001(1)(Q), and as also found by the trial court, Brandon's parental rights could be properly terminated based on his incarceration and concurrent inability to care for S.P.W. for not less than two years from the date on which the petition was filed, even considering the possibility of parole at some indefinable point in the future. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006).

Brandon next argues that his rights were unlawfully terminated because the TDFPS never met its statutory duty to provide him with an opportunity to comply with a service plan that might result in his regaining possession and conservatorship of S.P.W. Brandon argues that the TDFPS had a duty to provide a plan and that by failing to do so, it had no authority to then terminate his parental rights for the failure to comply with the plan. TEX. FAM. CODE ANN. § 263.101 (Vernon Supp. 2009) (requiring TDFPS to file service plan within forty-five days after temporary order grants it conservatorship). In so doing, Brandon attempts to import constitutional arguments suggesting that he was treated differently from the mother, thus his right to equal protection under the law or due process was also violated.

We have found ample evidence supports the first ground for termination, so even if Brandon's argument was valid, the ultimate result would be the termination of his parental rights. Consequently, it is unnecessary to address this issue. The contention of error is overruled.

17

Brandon also raises several contentions in which he argues, as has Princess, that the statutes restricting appeal are unconstitutional as limiting the ability of counsel to present reasoned points of error on appeal—because counsel has to draft his statement of points before he even has a copy of the record for review. *See* TEX. FAM. CODE ANN. § 263.405 (Vernon 2008). That argument has a considerable degree of validity. However, in this instance, as an admirably complete statement of points was timely filed, and no additional issues are suggested that would be unreviewable by this Court due to the statute, no harm can be shown, and as above, we cannot address the argument on the merits. Brandon also argues that the statute allowing the trial court to determine whether the appeal is frivolous is a violation of the constitutional separation of the branches of government. *See D.W.*, 249 S.W.3d at 640. In this instance, however, the court did not find the appeal to be frivolous, so even though the statute is suspect, Brandon has not been harmed by it, and his argument is thus not properly before this Court for review. The contentions of error are overruled.

## B. Best Interest of Child

Brandon also argues that the evidence does not prove it was in the best interest of the child for his parental rights to be terminated. We have already set out the relevant standard of review for this argument. As we noted above, Brandon is imprisoned for beating the mother of the child, and the information provided at the trial indicated that he had done so repeatedly. He has never provided care for S.P.W., has admitted providing no money for S.P.W., and will be imprisoned for

18

some years yet to come. The jury's determination is supported by clear and convincing evidence. The contention of error is overruled.

## V.    PATRICIA

The maternal grandmother of both children has appealed from the judgment of the trial court which denied her requests for managing conservatorship and access to and possession of the children. We first address the issues attacking the jury's findings on these matters. The jury was asked the following questions:

Should Patricia Williams be appointed managing conservator of the children?

. . . .

Should Patricia Williams be granted possession of or access to the children?

The jury's answer to both questions was "No." Section 161.207 of the Texas Family Code provides that the court shall appoint a suitable competent adult or TDFPS as managing conservator if the court terminates the parent-child relationship with respect to both parents or to the only living parent. TEX. FAM. CODE ANN. § 161.207 (Vernon 2008).

The grandmother, Patricia, sought conservatorship and possession or access based on her position that it was in the children's best interests to name her as sole managing conservator. This is a contention that the evidence is legally and factually insufficient to support the jury's finding that a state agency, rather than a relative, should be appointed as conservator of the children.

The standard of review for this matter is much different from that used above in reviewing termination. In cases tried to the court, conservatorship determinations are subject to review only for abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). In a jury trial, a trial court may not render an order in contravention of the jury's findings. TEX. FAM. CODE ANN. § 105.002(c)(1)(A) (Vernon Supp. 2009). The jury findings underlying a conservatorship appointment are subject to ordinary legal and factual sufficiency review. *In re J.A.J.*, 243 S.W.3d 611, 617 n.5 (Tex. 2007); s*ee, e.g.*, *Corrales v. Dep't of Family & Protective Servs.*, 155 S.W.3d 478, 487–88 (Tex. App.—El Paso 2004, no pet.). In analyzing these issues, we thus apply the familiar standard of review for legal and factual sufficiency in civil cases in which the burden of proof at trial was by a preponderance of the evidence. *See In re T.T.*, 228 S.W.3d 312, 325 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *Corrales*, 155 S.W.3d at 488.

"The best interest of the child shall always be the primary consideration of the court in determining issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (Vernon 2008). Cases such as the case at bar are "intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors." *Lenz v. Lenz*, 79 S.W.3d 10, 18–19 (Tex. 2002); *In re K.L.W.*, 300 S.W.3d 423, 425 (Tex. App.—Dallas 2009, no pet.).

20

In reviewing a challenge to the legal sufficiency of the evidence, we must determine whether the evidence, as a whole, would enable reasonable and fair-minded people to differ in their conclusions. *See OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 736 (Tex. App.—Dallas 2007, pet. denied). We view the evidence in the light favorable to the findings, crediting favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *See OAIC Commercial Assets*, 234 S.W.3d at 736.

When reviewing a factual insufficiency challenge, we consider all of the evidence and determine whether the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *See Corrales*, 155 S.W.3d at 488–89.

We note the presumption that appointing a parent as conservator that is so strongly embedded in Texas law is not implicated in this case, as a grandparent is the party involved. TEX. FAM. CODE ANN. § 101.024 (Vernon 2008), § 153.433 (Vernon Supp. 2009); *see Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990); *Critz v. Critz*, 297 S.W.3d 464, 468–71 (Tex. App.—Fort Worth 2009, no pet.); *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied).

The critical issue remains, as in all decisions of this nature, the best interest of the children. TEX. FAM. CODE ANN. § 153.002. Determining a minor's best interest requires the fact-finder to

review the possible benefits and detriments to the minor as enunciated in *Holley*, which we have previously enumerated. *Holley*, 544 S.W.2d at 371–72; *see In re C.A.M.M.*, 243 S.W.3d 211, 221 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

In this case, the TDFPS relies on evidence of Patricia's behavior to show that the jury's finding was supported by the evidence. There was evidence before the jury that on one occasion, Patricia had left the children with Princess, against the express terms of the order, and had used marihuana while so doing (the incident that immediately resulted in the children's removal by TDFPS). There was also evidence Patricia had been arrested in 2002 and received deferred adjudication for assault—but also that she had successfully completed the community supervision. She had been working as a health care provider, with her sole client being her own aged mother. That job had ended, and at the time of the hearing, she was unemployed.

The TDFPS also questioned Patricia about the loud and obnoxious behavior of two of her nieces and her other daughter (Chaleta) while in her company at the local hospital—sufficient that hospital personnel called the police, and about the behavior of Chaleta's son (a cousin to these children) who cursed and allegedly threatened the TDFPS officer while she was removing the children from Patricia's custody. (Specifically, the officer testified he was a "young male that addressed me as a bitch and said that he was going to whip my ass if I thought I was going to take his cousins.") Chaleta approached the worker and apologized for her son's behavior—and another man grabbed him and physically removed him from the area. The record also contains a

22

number of hypothetical questions by the TDFPS about how Patricia would react should the other grandparents or one of the fathers appear (as there was evidently a substantial feud developed between the families). The TDFPS attempted to show that Patricia had not attempted to protect the worker or intervene in the situation. The evidence is inconsistent as to whether Patricia was outside at the time. She testified that she only heard the commotion through the walls while she was getting the children ready to be taken by the TDFPS and taking J.A.W. to the bathroom, but the TDFPS worker testified Patricia was outside with the children at that time, and they had gone back in afterward so J.A.W. could use the bathroom.

The TDFPS also argues Patricia had not sought adequate assistance for Princess. That appears to be based on evidence that although Patricia acknowledged that Princess could not take care of herself, she had nevertheless failed to seek help from a local group that assists the mentally retarded, and did not get her into activities designed to help her with her domestic abuse situation. The TDFPS also attempted to obtain testimony to cast doubt on Patricia's statements that she had no alcohol or drug problem—and failed.

There was testimony that J.A.W. was having difficulties in school, and the TDFPS also elicited testimony from Patricia showing that she had failed to get more involved in J.A.W.'s school activities or to attempt to help her to progress despite difficulties pointed out by her teachers. There was also testimony that S.P.W. had lung problems from scar tissue, and required monitoring for breathing-related problems—and prompt use of a nebulizer for care. When asked

23

about her plans for the children, she described the room she had ready for them, complete with pink paint and stuffed animals, and how she wanted to take them home.

In contrast, there is testimony from Timika Wesley, a case manager for East Texas Child Advocates. She was appointed by the trial court as the guardian ad litem for the children, and had been involved with the case from February 2008. She testified she had attended every meeting TDFPS had set up, every court appearance, had reviewed the notes made by the TDFPS workers, the therapists, the medical notes about the children, and had talked with J.A.W., and had been in their presence in a number of contexts. Wesley stated that she had testified in more than twenty cases and that this was the only case in which she had not recommended termination. She testified that Patricia's home was clean, well kept, that the older child did not act out while there and that the caring relationship between Patricia and the children was obvious. She testified that she had actually seen the children four or five times (including court appearances). She acknowledged Patricia's use of marihuana, but also pointed out that it was a single mistake by Patricia. When asked if Patricia had since taken and passed a hair follicle test, Wesley answered "Yes."[5] Wesley also testified that from her first meeting with TDFPS, she believed the TDFPS never had any intention of returning the children and was seeking termination from the beginning. Her testimony, as narrowed by cross-examination, was that she believed Patricia would be an

---

[5]We recognize that the TDFPS promptly objected to that statement as not based on evidence before the court. Although there was some discussion, and a reformulation of the question by counsel, the court did not rule on its admissibility.

24

appropriate caregiver for the children—and that none of the other individuals involved in this action would be.

Evidence was placed before the jury that could have supported a variety of responses. There was evidence which, if believed by the jury, would have supported a conclusion that Patricia was a loving, reasonably capable caregiver for the children and that she had finally realized that she simply could not, under any circumstances, leave Princess alone with the children. There was evidence of drug use, but that evidence was of a single use, which the jury could have concluded was the only time that mistake was made. There was evidence that much of the extended family was destructive and combative and that Patricia nonetheless remained in their company—although there was also evidence that she would control their access and proximity to the children. There was evidence that she was unemployed, but looking for work, and that she had recently moved, but that her new apartment had a room ready for the children. There was evidence that she loved the children and would do what was best for them, but also evidence that she had not made efforts to assist Princess in obtaining help, or J.A.W. in becoming more capable at school. There was evidence that J.A.W. had seemed well-adjusted while at Patricia's home, but also evidence that when she entered school at age six, she was only at about a three- to four-year age level of capability, and emotionally uncontrolled—and that this improved when she went into foster care and began having more directed training and assistance.

The jury's role in this proceeding is to sort the wheat from the chaff and determine which positions are viable. The court of appeals is not a fact-finder. Accordingly, we may not pass on the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). Under the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the jury's finding that Patricia should not be appointed sole managing conservator of the children. *See Corrales*, 155 S.W.3d at 489–91 (concluding evidence legally and factually sufficient to support jury's finding that TDFPS rather than children's grandmother should be appointed sole managing conservator on termination of parents' parental rights). The contention of error is overruled.

## VI. *BATSON* CHALLENGE

Princess, Patricia, and Brandon all contend that the trial court committed reversible error by overruling her *Batson* objection to strikes made by the TDFPS.

This argument by Princess and Brandon, however, is foreclosed by the fact that they did not voice their own objections and because there was no ruling by the court that the objections of one co-party were deemed joined by all. In such an instance, the claim of *Batson* error is not preserved for review as to Princess or by Brandon, but is preserved as to Patricia, whose attorney raised the objection. *See Southwell v. Univ. of Incarnate Word*, 974 S.W.3d 351, 353–54 (Tex. App.—San Antonio 1998, pet. denied); *Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d

26

551, 556 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998); *How Ins. Co. v. Patriot Fin. Servs. of Tex., Inc.*, 786 S.W.2d 533, 544–45 (Tex. App.—Austin 1990, writ denied), *overruled on other grounds*, 843 S.W.2d 464 (Tex. 1992); Frederick C. Moss, RETHINKING TEXAS EVIDENCE RULE 103, 56 BAYLOR L. REV. 503, 539–40 (2004).

We now turn to a review of the *Batson* contention as presented on behalf of Patricia. In *Batson*, the United States Supreme Court, under the Equal Protection Clause, prohibited the use of racially discriminatory peremptory challenges by the State in an individual trial. In *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991), the right was extended to civil litigants. *See Powers v. Palacios*, 813 S.W.2d 489, 491 (Tex. 1991).

Under *Batson* procedures, the opponent of the peremptory challenge must first establish a prima facie case of racial discrimination, and the burden then shifts to the party who exercised the strike to come forward with a race-neutral explanation; at the third step of the process, the trial court must determine if the party challenging the strike has proven purposeful racial discrimination, and the trial court may believe or not believe the explanation offered by the party who exercised the peremptory challenge. *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508 (Tex. 2008).

In contrast to the federal system, which employs a "clearly erroneous" standard of review, we review a trial court's *Batson* ruling for abuse of discretion. *Davis*, 268 S.W.3d at 515. A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997). The *Davis* opinion

relies heavily on the most recent United States Supreme Court decision on the issue, *Miller-El v. Dretke*, 545 U.S. 231, 237 (2005). The *Davis* court recognized that the entirety of the situation was to be reviewed in determining the *Batson* challenge, and pointed out the factors that were used by the United States Supreme Court in *Miller-El* to assist in making its decision. Those factors included an analysis of statistical data about the prosecution's use of its peremptory strikes (strikes used to exclude ninety-one percent of the eligible African-American venire members), a side-by-side comparison of the reasons given to strike black panelists and white panelists who were allowed to serve despite similar situations, and other considerations not applicable here. *Id.* at 260–63.

The *Davis* court also noted that a *Batson* challenge does not call for a "mere exercise in thinking up any rational basis" and that the prosecutor either stands or falls on the plausibility of the reasons he or she gives—not on the basis of reasons substituted by the appellate court. *Miller-El*, 545 U.S. at 251–52.

At the end of voir dire, Patricia raised the objection after the TDFPS struck the only two African-American venire members. The TDFPS stated that as to the first juror, Chris Gray, the strike was because Gray had indicated that she knew Princess, had watched her grow up, and knew Patricia, and had been a friend for years.

Defense counsel argues that Gray's answers were somewhat different from those recounted by the TDFPS—mainly because Gray made it clear that they had never been close

28

friends or visited in each other's homes, and because Gray had not seen them in the eight years since Gray had moved away. She stated she had lost contact with Patricia, "But every now and then I run into her like in the mall. I've watched those children grow up." She knew Princess as well, but she did not get together with Patricia as she was a busy single parent. When the children graduated, "I kind of went my way and she went her way."

Based on these answers, counsel argues that the court abused its discretion by overruling the *Batson* challenge. He argues the TDFPS has failed to show that its strike was for race-neutral reasons—and that its explanation was nothing more than a pretext for the strike, because Gray's actual answers show that she was not a close friend of Patricia, had not seen her for over eight years, and they did not see each other socially.

We disagree. Although the relationship was not close, the fact remained that there was a degree of familiarity between Gray, Patricia, and Princess, they had at one time been neighbors, and she knew both Princess and Patricia to some degree. It is viable, and not a racially based explanation. We conclude the trial court did not abuse its discretion by overruling the *Batson* challenge.

The prosecutor stated as to the second juror, Darwin Johnson, that he was concerned about his answer to a question about domestic violence:

> [By TDFPS:] And he answered that question in a very peculiar way, at least that I found to be peculiar, and I noted so on my notes at the time that he answered that. That he wouldn't hold it against a mother who was the victim of family violence -- Mr. Bratteli did ask this -- if it wasn't her fault for -- or something to that effect.

29

But he seemed to -- it just made a question in my mind as to like, well then does that mean it's like it's okay under some circumstances to have family violence against a spouse or a mother?

. . . .

I don't know that, you know, he said that, but that was the implication I took from it. And it's off the strength of that, given the nature that family violence is just entwined so much in this case, that, you know, I felt like that was a good reason to strike him.

When examined by defense counsel and questioned about whether other venire members answered similarly, the TDFPS went on to testify that:

There was a couple other folks that did, but it was just the way that Mr. Johnson answered that question that, you know, if she didn't cause -- if she wasn't at fault for it, he wouldn't hold that against her. It's the way that he answered it that just like really grabbed my attention. Because there again, as I just said it, seemed to me by implication it was okay under some circumstances to have family violence.

The reason stated by counsel is race-neutral. The appellants argue that the record indicates that other venire members gave similar answers and were treated differently than the African American. "'Disparate treatment,' as such, cannot automatically be imputed in every situation where one of the [TDFPS's] reasons for striking a venireperson would technically apply to another venireperson whom the [TDFPS] found acceptable." *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992). "[I]t is unlikely that two venirepersons on one panel will possess the same objectionable attribute or character trait in precisely the same degree. Such qualitative distinctions may cause a prosecutor to challenge one venireperson and not the other." *Id.* Furthermore, we give great deference to the trial court's decision on the issue of purposeful

discrimination because it requires an assessment of the credibility and content of the prosecutor's reasons and all other relevant facts and circumstances. *Alexander v. State*, 866 S.W.2d 1, 8 (Tex. Crim. App. 1993). We cannot clearly say from the words used that what he gleaned as Johnson's intent is a correct understanding of his meaning. However, it is a possible meaning of his statement, and counsel and the court had the opportunity to observe the witness' demeanor. In such a situation, we cannot conclude that the trial court's decision was outside the scope of its discretion. The point of error is overruled.

We affirm the judgment.


Jack Carter
Justice

Date Submitted:     January 26, 2010
Date Decided:       April 1, 2010